Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 1 of 52

**1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



WILMINGTON SAVINGS FUND SOCIETY, FSB,    )
                                         )
              Plaintiff,                 )
                                         )
       vs.                               )    No. 20 C 7032
                                         )
JAMES A. COSMANO, et al.,                )    Chicago, Illinois
                                         )    May 5, 2022
              Defendants.                )    10:00 o'clock a.m.


              TRANSCRIPT OF PROCEEDINGS - Hearing
              BEFORE THE HONORABLE MANISH S. SHAH


APPEARANCES:

For the Plaintiff/        KLUEVER LAW GROUP, L.L.C
Counter-Defendant:        BY:  MR. JASON D. ALTMAN
                          225 West Washington Street, Suite 1550
                          Chicago, Illinois  60606
                          (312) 201-6658

For Defendant Cosmano:    COTSIRILOS, TIGHE, STREICKER, POULOS
                          & CAMPBELL, LTD.
                          BY:  MR. ERIC S. PRUITT
                          33 North Dearborn Street, Suite 600
                          Chicago, Illinois  60602
                          (312) 263-0345

                          BACH LAW OFFICES
                          BY:  MR. PAUL M. BACH
                          P.O. Box 1285
                          Northbrook, Illinois  60065
                          (847) 564-0808

For Defendant/Counter-    U.S. DEPARTMENT OF JUSTICE
Claimant United States:   TAX DIVISION
                          BY:  MR. BRADLEY A. SARNELL
                               MR. NOAH D. GLOVER-ETTRICH
(telephonically)               MR. JEFFREY N. NUNEZ
                          P.O. Box 55
                          Washington, D.C.  20044
                          (202) 307-1038


                **Colleen M. Conway, Official Court Reporter**

Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 2 of 52

**2**

APPEARANCES (Continued):

Also Present:                    MR. JAMES A. COSMANO

**I  N  D  E  X**

**WITNESSES:**                                                    **PAGES**

**GENEVA EVERETT**

Direct Examination by Mr. Sarnell                    21

Cross-Examination by Mr. Pruitt                      29

**E  X  H  I  B  I  T  S**

                                                                  **PAGES**

Government Exhibit A                                  25

COLLEEN M. CONWAY, CSR, RMR, CRR
Official Court Reporter
219 South Dearborn Street, Room 1918
Chicago, Illinois 60604
(312) 435-5594
*colleen_conway@ilnd.uscourts.gov*

3

(Proceedings heard in open court:)

THE CLERK:  20 C 7032, Wilmington Savings Fund versus Cosmano.

THE COURT:  Good morning, everyone.  Why don't we start with appearances for the record.  I'll start to my right and start with Wilmington.

MR. ALTMAN:  Good morning, Your Honor.  Jason Altman for plaintiff.

MR. PRUITT:  Good morning, Your Honor.  Eric Pruitt and Paul Bach on behalf of Mr. Cosmano.

THE COURT:  And Mr. Cosmano is present this morning.

MR. COSMANO:  Good morning, Your Honor.

MR. PRUITT:  He is, and seated at my right, Your Honor.

MR. COSMANO:  Good morning.

MR. SARNELL:  Good morning, Your Honor.  Bradley Sarnell and Noah Glover-Ettrich for the United States.

THE COURT:  And counsel on the phone?

MR. NUNEZ:  Good morning, Your Honor.  Jeffrey Nunez, U.S. Department of Justice, on behalf of the United States.

THE COURT:  Good morning, everyone.

There are a few different moving pieces that we've got on the agenda today.

What I'd like to do first is address the motion to reassign the motion for withdrawal of the bankruptcy reference.

**4**

I have the response.  So let me direct a couple of questions to the government.

This case, this foreclosure case, is, in some ways, effectively over.  A final judgment of foreclosure has been entered.  The contempt question does not necessarily require me to resolve whether any conduct was an attempt to evade or defeat the tax.

If I resolve the contempt issue in question today, then that also would be over.  And I would have to have another proceeding to address whether to withdraw the bankruptcy reference and, if necessary, conduct the adversary proceeding.

So my question is, how is there a substantial savings in judicial effort from reassignment?  And are they really susceptible to resolution in a single proceeding?

MR. GLOVER-ETTRICH:  Yes, Your Honor.  This is Noah Glover-Ettrich for the United States.

The United States' position is that there would be a substantial saving of time because the factual record that is developed today during these contempt proceedings bears materially upon the dischargeability question that is at issue in the underlying adversary proceeding.  And we believe that the contempt of Mr. Cosmano is a willful attempt to evade or defeat his taxes in any manner.  And so that a finding of contempt today could independently dispose of the adversary proceeding question.

Colleen M. Conway, Official Court Reporter

Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 5 of 52

**5**

And so in that sense, the two proceedings are related and they are susceptible to simultaneous disposition.  However, Your Honor, we do acknowledge that the record made today will have to be ported into the Court's analysis on the issue of whether to withdraw the reference.

So the disposition will not be immediate, but the record developed today bears decisively on the dischargeability question, and it makes sense, Your Honor, for this Court to decide that issue in tandem with the withdrawal of the bankruptcy reference and, ultimately, if the reference is withdrawn, decide the dischargeability question in view of the record made here today.

THE COURT:  Would the tandem approach that you are recommending, would that delay this contempt proceeding?

MR. GLOVER-ETTRICH:  No, Your Honor.  Our position is that there would be no delay, because the proceeding today can go forward.  All the United States submits is that the record made today be considered down the road when the Court reviews the motion to withdraw the reference.

THE COURT:  Thank you.  Okay.  I appreciate the answers to my inquiry.

Is there anything else the government would like to say by way of reply in support of the motion for reassignment?

MR. GLOVER-ETTRICH:  Yes, Your Honor.

I would just say, in brief, Mr. Cosmano's response, I

Colleen M. Conway, Official Court Reporter

**6**

believe, misunderstands the test for reassignment which is currently before the Court.  There's much discussion of forum shopping by the United States.  And while we vociferously oppose that suggestion, as well as the intimation that the bankruptcy judge, Judge Goldgar, has made comments below about the merits of the case, we submit that forum shopping is not relevant to the judge's inquiry today; and that the inquiry today is simply whether Your Honor should decide this, or your colleague, Judge Valderrama, and we submit that your familiarity with the facts that comprise the basis for Mr. Cosmano's contempt will make you a better poised individual to decide the issue of withdrawal of the reference than Judge Valderrama, who has no exposure to either case, has no knowledge of the facts relevant to the proceeding today.  And so judicial economy would be substantially furthered by reassignment of the matter to Your Honor.

And I would also note, Your Honor, I think there is a misunderstanding on Mr. Cosmano's part about what the earlier case is.  The earlier case, as our brief reflects, is this contempt proceeding.  And there -- as we have stated previously, there will be no delay to this contempt proceeding. It, indeed, can go forward, and shall go forward today, unimpeded.

That's all, Your Honor.

THE COURT:  Thank you.

7

The motion to reassign is denied.  I do -- first, I do find that the two cases are related -- they involve the same subject matter, and there's factual overlap -- but I don't agree that reassignment under the local rule is appropriate.

The government's approach to fold in issues in this contempt proceeding with the withdrawal of the bankruptcy reference and then, ultimately, the underlying adversary proceeding is not going to result in a substantial saving of judicial time and effort.  It is effectively a two-step process in any event.  And whether that's before me or before Judge Valderrama, I don't agree that there is a substantial savings in judicial time and effort by reassigning and having the case, the bankruptcy withdrawal issue, before me.

And that two-step process also persuades me that we're not talking about susceptibility to disposition in a single proceeding.  I am moderately confident that I can resolve the contempt issue today, which would mean that anything that has to happen with the withdrawal of the reference would be a different proceeding than this one.

And so for those reasons, the motion to reassign is denied.

Let's talk about the contempt, the contempt issue, which is the other reason why we're here this morning, the rule to show cause, which I did issue.  And Mr. Cosmano is present in person.  I received the response.

8

I have a couple of questions that I think might frame what I'd like to do today.

MR. SARNELL:  Your Honor, before we get to any questions -- and I apologize -- I have been instructed to disclose, at the beginning of this hearing, the Tax Division has made a referral to the local U.S. Attorney's Office to determine whether a crime has been committed by Mr. Cosmano.

The Tax Division's not going to be involved down the line.  We have nothing beyond the referral.  But as a matter of candor to the Court, I figured I should point that out before anything -- we go any further with the show cause.

THE COURT:  Thank you.  I appreciate that disclosure because it might bear on how we move forward this morning. Because, procedurally, the way it's teed up is that I am asking Mr. Cosmano to discharge the rule to show cause and show cause why he should not be held in contempt, and that referral may affect his approach to these proceedings.  Because I do have some factual questions about what happened and is happening with this unit.

So what I'll do now is let me put out there what my questions are.  And I think, ultimately, Mr. Pruitt, I will ask you, how does Mr. Cosmano want to address those?  And I'll take those into account when deciding how to proceed this morning.

One thing -- and so here's one question.  One thing that's not clear to me from the written response is the issue

**9**

of the wall.  I see in the response issues of other fixtures, countertops, the efforts to return items, but what I have not seen is any explanation for the wall being, apparently, according to the government's version of events, removed or taken down or somehow dismantled.  And paragraph 5 of the order enforcing the order appointing the receiver -- I think it's actually paragraph 5 of the original order -- does make it clear that no party shall take any action to remove the wall.

I have a question about, just generally, what was going on at that unit, particularly on March 4th and 5th of 2022.  I have evidence before me now that I do find, at least on the current record, to be reliable that Mr. Cosmano was onsite and directing the removal of property.  There's evidence that's been submitted that he accessed the unit after the locks were changed.

And then paragraph 4 of the March 6th order does make it clear that all fixtures or appliances removed from the subject property shall be immediately returned, and I have evidence that, as of March 14th, Mr. Cosmano did not return all fixtures or appliances.

And that paragraph of that order doesn't have any kind of time limitation on when they were removed.  It just says return everything.  And that hasn't happened, at least as of today.

And there was some communication or effort, but it

**10**

didn't happen in response to the March 6th order.  So the question is, why isn't that a contempt of the March 6th order?

So I understand some of the other points that have been raised in the written filings, but those are the factual questions that are most presently on my mind.

And so let me ask you, Mr. Pruitt, how would you like to -- and if you choose not to -- respond to those factual questions?

MR. PRUITT:  Thank you, Your Honor.

I had some concern about coming into this hearing, about what I have just heard from the Tax Division, and in light of that, as I think the Court can appreciate, Mr. Cosmano will respectfully have to invoke his Fifth Amendment rights today.  And so I think that does, to a certain extent, cabin my ability to factually respond to some of these things, Your Honor.

I will say, with respect to the wall, it was clearly covered by the order.  I don't think, for the same reasons I pointed out in our response, Your Honor, think there's sufficient clear and convincing evidence of when it was destroyed to link this to the contempt.

But clearly, it was covered by the order, Your Honor. I mean, there's no disputing that.  And there's also no disputing that it was, in fact, destroyed.

With respect to March 4th and 5th, Your Honor, look,

**11**

there is no disputing that there are multiple witnesses who put in there that he was removing some kind of property.  Again, you know, I think we're somewhat cabined to our ability to factually respond to that.  But I think, Your Honor -- and also, look, the order of March 6th did clearly call for everything to be returned.  Everything was not.  And, you know, that -- that is also undeniably true, Your Honor.

I think, as we said in our motion, and I'd just say, in no way do we mean by any of our positions to undermine the seriousness of the Court's orders, the necessity for compliance of those orders, or the alleged conduct, but we are today coming into court ready, to his fullest ability, to discharge the contempt by returning the items he does have and coming up with some basis for paying the government for, you know, what else is determined to be reasonably related to missing items and damage done and the removal of those items.

I think our only issue is the reasonableness of those costs.  And I think that was somewhat underscored by the declaration that was filed last night by the receiver that did point out there is a bit of confusion, and these things do need to be worked through, I think, a little bit more deliberately.

Your Honor, I would just say kind of finally on that note that, you know, Mr. Cosmano's ability to immediately cure the financial side of this will depend greatly on what that final dollar amount is.

**Colleen M. Conway, Official Court Reporter**

Case 24-09140   Doc 134-23   Filed 07/31/26   Entered 07/31/26 13:53:19   Desc
Exhibit 23: Transcript of May 5   2022 Contempt Hearing   Page 12 of 52

Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 12 of 52

**12**

THE COURT:  Thank you.

Let me ask the government, then factually, whether you want to supplement anything.

I obviously saw the supplemental declaration.  But is there anything -- let's start with, for example, the wall, with respect to the timing of the wall and its apparent destruction.

Is there anything, A, you want to just point out to me that has already been submitted in the record for that chronology or any factual -- additional facts you want to present on that question?

MR. SARNELL:  On the question of the wall, Mr. Cosmano and whatever associates he had were the only people in the -- were the only people in that room who would have seen it being taken down.  We have evidence of when it was up, and we have evidence of when he was in the unit taking things down. We --

THE COURT:  May I interrupt, just to ask --

MR. SARNELL:  Sure.

THE COURT:  -- when is the last date, from the government's evidence, that the wall was up?

MR. SARNELL:  The last date is the date on which the -- we know the wall was up was November the 13th, the day the receiver was last in the building.

We do have evidence that Mr. Cosmano was not in -- was not in the unit in between the time that the order was

**13**

issued, between that time and the beginning of March when he took the wall down.

He also has not, and apparently will not, controvert the fact that he took the wall down during those dates.  If he wishes to actually make a showing of that, he can take the stand.  He is apparently choosing not to.

THE COURT:  And I am sorry, I interrupted you.  If there's anything else you wanted to say about the chronology on the wall.

MR. SARNELL:  There's nothing -- there's nothing I have about the chronology of the wall specifically.  If Your Honor would like, we can provide evidence that he wasn't in the unit prior to that and, therefore, couldn't have taken the wall down on any other date.

THE COURT:  Do you have any evidence that he wasn't in the unit between November and February?

MR. SARNELL:  We do, Your Honor.

THE COURT:  Can you flesh that out for me, please?

MR. SARNELL:  We have a -- we have an affidavit, and we have a witness here and prepared to testify.

THE COURT:  Let's start -- do you -- is the affidavit already in the record?  Can you point me --

MR. SARNELL:  It is not, Your Honor.

THE COURT:  Then let me -- and I apologize that I am constantly looking at the clock.  It's because I have a matter

Colleen M. Conway, Official Court Reporter

Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 14 of 52

**14**

at 10:30 that I am going to have to break to take.

But let me ask the government next about your estimate that you've provided and ask you to reply a little bit in response to what Mr. Cosmano has filed, in questioning whether everything that you've itemized is really appropriately tailored to the damage, versus wear and tear, versus possible overinclusiveness that, if further meeting and conferring were done, you might be able to reach some more common ground as to estimating the damage as you see it.

MR. SARNELL:  So Mr. Cosmano's approach misses the forest for the trees here.  So he wants the Court to ignore the numerous violations and instead, you know, nitpick about damages, a thousand dollars here, a thousand dollars there.

He has -- he's made a promise to return some property, to make some undefined payment, and thinks that, therefore, we should move on.  But we don't even know what the universe of damages is.  We know the obvious things that are missing, and we know what the cost of doing the repairs is, but that's different from the damages, Your Honor.

The damage to the United States is $225,000, which is the delta between what the property would have sold for had Mr. Cosmano not come in and deliberately violated Your Honor's order and what it can sell for now as-is.

And maybe that number could change a little bit depending on what comes back and in what condition it is to --

**15**

and what condition it is found.

So the refrigerator, for example.  It is a refrigerator.  It has been brought back.  It is nonfunctional.

So if he is to bring back a number of other appliances, all of which are nonfunctional, or a broken sink or anything like that, it doesn't change that the United States is still out a bunch of money.  The repairs are just the easiest and most efficient way to get to even that low level of recompense to the government.

But what's also missing here -- and Your Honor's first question, I think rightly, was about the wall.  And there wasn't just that we wanted the wall up.  The wall is the -- the wall was there protecting something.  Because you don't put a wall up for no reason, and you don't take it down for no reason.

And what we want to know -- and I personally believe Mr. Cosmano should take the stand and say what was behind that wall, because that's why that -- that's why that was in there.

I mean, the provision -- the house wasn't going to be sold with the wall up.  That wall provision was there to make sure that Mr. Cosmano didn't do what he did, which is to walk into that apartment, take the wall down and take whatever was behind it.  We'll never know what's there unless Mr. Cosmano tells us.  And I think he should be ordered to do so.

Because that is where you start getting at the

**16**

government's damages.  If there were valuable items back there that were subject to the government's liens, we're entitled to know and we're entitled to recompense.

And in addition, what I believe is in the record and that Mr. Pruitt has certainly told me is that there are certain items that Mr. Cosmano says he doesn't have anymore.  The kitchen cabinets, I would note.

And if Mr. Cosmano came in and took the cabinets and then disposed of them in some way, he should -- trying to determine what the, you know, monetary value of those might be doesn't get to the heart of the contempt.  We need to know where they are.  And I think he should be ordered to get them back.  If he sold them to somebody, he should be -- he should go and get them.  If he gave them to somebody to put in storage somewhere, he can go get them.

That's how you purge the contempt here, is by disclosure, and by remedying it by giving everything back that was there, which starts with Mr. Cosmano testifying as to what was there.

THE COURT:  Would you agree that some of these items, in a sense, are fungible with other replacement items?  And this could be measured in some sort of economic value, which then, while it would be a burden on the receiver to rebuild, to make the property a marketable one, which is my order as part of the judgment of foreclosure that this be a marketable

**17**

property, but that would be arguably an alternative way of assessing and perhaps more quickly get things back on track for a sale?

MR. SARNELL:  Leaving aside the issues of the things that we don't know about and that Mr. Cosmano has provided no evidence about, to an extent, yes, they are fungible, and I think that's what's in the -- I think that's what the estimate, in large part, reflects; that to go back and say that Mr. Cosmano came in and ripped out the cabinetry, but then we have to go and we have to find 14-year-old cabinets is ludicrous. He's in no position to say that, "Well, I took these and I destroyed them," or, "I sold them," or otherwise disposed of them.

But the government can only get -- you know, if the cabinets cost $50,000 -- I believe that's what's in there. It's 50 or 70 thousand dollars is what's in the appraisal.  But to say, "Well, there's wear and tear.  We're going to give the government back $25,000," repairs that we can't make, you know, some money to make some of the repairs, doesn't get us there. What we need to do -- and that's why the -- that's why we asked for what we did, is to put the property back in the condition that it was previously.

And the receiver's original declaration said that the place was pristine.  The fixtures were new.  The trims were new.  There wasn't any damage.  I mean, one would assume that

**18**

she would have mentioned any damage to the walls or the floors. Had the shelving been ripped out at the time, she would have said something.  But there's no indication in there that this property was in anything other than pristine condition.  And it's always sort of been the gov -- and that predated any of the damage.  It's always been sort of the government's view that Mr. Cosmano wasn't living in this place.  You don't put a wall up in front of your master bedroom in the house that you're living in.

So the "wear and tear" argument, I think, is a little bit thin unless Mr. Cosmano, again, would like to take the stand and say that he was there every day.  I don't know who was wearing and/or tearing any of this property.

THE COURT:  Okay.  Here's what we're going to do.  We are going to take a break in this case so I can attend to another matter.

I would like the government to supplement its factual presentation with the evidence you'd like to submit about -- that you believe supports an inference that Mr. Cosmano was not in the unit between November and, I suspect you would argue, March 4th or 5th.  But however you want to supplement your evidence on that chronology in support of your argument that the wall was up in November and it didn't come down until after my orders.  I'll give you an opportunity to do that.  And if you want to do that through an affidavit, I'll entertain an

Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 19 of 52

**19**

affidavit.  I'll hear any arguments from the defense to undermine the weight of the government's evidence.  If you want to put on a witness, we can do that as well.

I don't think I need any other evidentiary information or factual information by way of presentation.  And I can hear further argument on what findings I should make and the consequences.  So I think I'll be in a position to do that after we resume.

I have -- why don't we resume at a little after 11:00, as soon as we're ready for you, and we can talk about how we're going to proceed next.  I have a couple of other matters today, so we may have a few interruptions.  But generally, I don't think I need a huge amount of time from you today in order to resolve the questions.

So let's take a recess and we'll reconvene a little shortly after 11:00 a.m.

MR. SARNELL:  Understood.  Thank you very much, Your Honor.

(Whereupon, the Court heard another matter on his call.)

(Resume at 10:57 a.m.  Witness in.)

THE CLERK:  Recalling 20 C 7032, Wilmington Savings Fund versus Cosmano.

THE COURT:  Good morning again.  We're all reconvened.

And when we took the break, I said that I'd entertain

Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 20 of 52

**20**

some factual supplementation from the government.

How would you like to proceed?

MR. SARNELL:  We're going to call a witness.

But there is one point that I don't believe I made previously that would -- that I think bears mentioning, which is that Your Honor entered an order saying that the wall should be left intact, nobody should touch it.

If the wall had already been taken down at that point, it is stunning to believe that no mention would have been made of it to Your Honor, to say, "Oh, there's no longer a wall there, and, therefore, I can't be held to have not complied with it, because the wall's already down."  No such disclosure was ever made.

But on the --

THE COURT:  Understood.

MR. SARNELL:  On the factual side, the United States would like to call Geneva Everett to the stand, please.

THE COURT:  If you could step up to this witness stand over here, please.

MR. SARNELL:  And, Your Honor, am I good here or should I go to the lectern?

THE COURT:  You can stay at your seat and question from the table.

THE WITNESS:  Over here?

THE COURT:  The chair that I am pointing to.

Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 21 of 52

**Everett - direct by Sarnell**                                    **21**

Please raise your right hand.

(Witness duly sworn.)

THE COURT:  You may take a seat.  And you may remove your mask while you're testifying.

THE WITNESS:  Okay.

(Witness removes facial mask.)

THE COURT:  And, government counsel, you may proceed.

GENEVA EVERETT, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SARNELL:

Q.  Good morning.  Can you state and spell your name for the record.

A.  Geneva, G-e-n-e-v-a, Everett, E-v-e-r-e-t-t.

Q.  And what is your occupation?

A.  Property manager for First Service Residential.

Q.  And where is your post of duty?

A.  Chandler Condominium Association at 450 East Waterside Drive in Chicago, Illinois.

Q.  And what do you do as a property manager?

A.  All sorts of things, I suppose.  I manage the property's security.  I hire the door staff and maintenance staff.  We manage the operating budget and capital projects for the property, and respond to resident inquiries and concerns and issues.

Q.  Okay.  And is your office physically located within The

Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 22 of 52

**Everett - direct by Sarnell**                                    **22**

Chandler?

**A.** Yes, on the first level of the building, off the lobby.

**Q.** How many entrances does The Chandler have?

**A.** Many.  I would have to count them.  The front lobby, the side door on the south side of the building, the north entrance off the river, and then the garage door on the waterside level. There is a pedestrian entrance on the lowest level off Wacker. There is a garage entrance on Wacker, on P-5.

Trying to think if there's any more.  Wait one second.

And then there's another door at the billiard room. So there's one, two, three, four -- eight.

**Q.** And is access to any of those entrances controlled?

**A.** Yes, with a key fob system and a garage fob system.  So there's two different kinds of access control devices to entrance -- to enter those different doors.

**Q.** And are residents issued access control devices to allow them to access those entrances?

**A.** Yes.

**Q.** How many?

**A.** It depends on how long the person's owned the unit.  We started managing the property in 2018.  And when the building was opened, there were a different number of key fobs and key -- garage door key fobs issued to different units.

So it depends on the unit.  They can order more.

**Colleen M. Conway, Official Court Reporter**

Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 23 of 52

Everett - direct by Sarnell                 **23**

**Q.** And when an access control device is used, is there any record made of the use of such access control device?

**A.** Yes.  We have a Keri, K-e-r-i, system, that records it --

**Q.** And --

**A.** -- electronically.

**Q.** -- when you say the system records it, does it do so automatically?

**A.** Yes.

**Q.** Okay.  And is that record made at or around the time that the access control device is used to access The Chandler?

**A.** Yes.

**Q.** Are you familiar with these sorts of -- the reports that are generated by the Keri system?

**A.** Yes.  We've been trained on how to download those reports.

**Q.** And do you look at them as sort of a part of your regular business duties as a property manager?

**A.** Yes.

**Q.** All right.  Have you -- are you familiar with James Cosmano?

**A.** Yes.

**Q.** And how do you know him?

**A.** He's an owner at The Chandler, Unit 1301.

**Q.** And was Mr. Cosmano issued access control devices as an owner of the unit in The Chandler?

**A.** Yes.

Colleen M. Conway, Official Court Reporter

Everett - direct by Sarnell                                    **24**

Q.  How many?

A.  I would have to look at the records --

Q.  Is there --

A.  -- to be certain.

Q.  Is it more than one?

A.  Yes.

Q.  Would he have been issued both a key fob and a garage door opener?

A.  Yes.

Q.  At the very least?

A.  That is standard, yes.

Q.  Okay.  I am going to --

        MR. SARNELL:  If I may approach the witness?

        THE COURT:  You may.

        One thing you could do is if you want to just use the document camera --

        MR. SARNELL:  Oh.

        THE COURT:  -- at the lectern --

        MR. SARNELL:  Oh, I can absolutely do that.

        THE COURT:  -- you can present documents that way.

        MR. SARNELL:  I will pass a copy to Mr. Pruitt.

        All right.  Let's see if I can get this to work. You'll have to bear with me ever so slightly, Your Honor.  This is my first time with the document system.

        Oh, wow.  Okay.  If I wanted to zoom out?  Oh, that's

Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 25 of 52

**Everett - direct by Sarnell**                                    **25**

fantastic.

BY MR. SARNELL:

**Q.** All right.  I am giving you what is marked down here at the bottom as -- or I am showing you what is marked down here at the bottom as Exhibit A.  I'll slide it up so --

**A.** Yeah.

**Q.** -- you can see it there.

**A.** I see that.

**Q.** Have you seen this document before?

**A.** Yes.

**Q.** What is it?

**A.** It's a downloaded report of key fob activity for Unit 1301, James Cosmano.

**Q.** And --

**A.** The garage door opener fob activity.

**Q.** And if I was to show you one of the other pages, does it also cover other uses other than the garage door?

**A.** Yes.  Each page represents a different device, so a different key fob or a different garage door opener.

        MR. SARNELL:  Okay.  I would like to submit this into evidence as Government's Exhibit A.

        THE COURT:  Any objection?

        MR. PRUITT:  No objection, Your Honor.

        THE COURT:  It's admitted.

    (Government Exhibit A received in evidence.)

**Everett - direct by Sarnell** 26

MR. SARNELL: Okay.

BY MR. SARNELL:

Q. I want to just walk you through the columns on this very quickly.

The first column on the far left, what do those dates represent?

A. The date of use.

Q. Okay. And the second column?

A. Time of use.

Q. And that is prevailing local time, is that correct?

A. Yes.

Q. And the third column, what does that represent?

A. The door that the device was used on.

Q. And so here where it says "L-5 Overhead Door Receiver," what does that entail?

A. The lower Wacker P-5 overhead garage door.

Q. And on this page as well, the -- when it says "First Fl Overhead Door Receiver"?

A. The waterside garage door.

We have two entrances to the garage.

Q. On this page, what is the "Dog Door Exterior"?

A. I know. They're not named that great.

That is the south door where we expect dogs to enter and exit the building instead of our main lobby. It's also where the dry cleaner is and our package room.

Colleen M. Conway, Official Court Reporter

Everett - direct by Sarnell                    27

Q. And --

A. So it's directly west of our main entrance.

Q. The "West Interior Access Door"?

A. That is the door interior.  So it's the second door after you have entered the building to get into the mail room or main elevator lobby of the building.  So it's the second door after the dog door.

Q. And where is the "L-5 Elev. Lobby"?

A. It is the elevator lobby to enter the residential units, after you have entered the lowest level of the garage to come up to the lobby.

Q. And the "L-5 Freight Elev. Lobby"?

A. It's a separate elevator bank to access the units.

So we have two elevator banks in the garage.  The elevator lobby -- the elevator lobby elevators just come from the garage to the lobby, and the freight elevator goes all the way up to access the units.

Q. Okay.  And have you reviewed The Chandler's access records with regard to James Cosmano?

A. Yes.

Q. Is there any record of James Cosmano accessing The Chandler in 2020?

A. If you could flip through, I can answer that.

Q. Did you know at one point whether or not he had accessed The Chandler in 2020?

**Everett - direct by Sarnell**                                    **28**

THE COURT:  Well, the document is in evidence, so you can --

MR. SARNELL:  Okay.

THE COURT:  -- just show --

MR. SARNELL:  Okay.

THE COURT:  -- whether there's any -- it's on the screen.

MR. SARNELL:  Oh, okay.

THE COURT:  You can flip through it and --

MR. SARNELL:  Is there -- understood.

MR. PRUITT:  Your Honor, if I may?  I mean --

BY THE WITNESS:

A.  Yes.

MR. PRUITT:  -- Mr. Cosmano will concede what the document says.

BY THE WITNESS:

A.  So right there.

BY MR. SARNELL:

Q.  So is there any --

A.  Yes.

Q.  Is there any evidence that he entered The Chandler at any point in 2021?

A.  2021?  No.

Q.  Is there anything in the key fob record or the garage entry record that showed that he entered the property at any point in

Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 29 of 52

Everett - cross by Pruitt                    **29**

2022, before March the 2nd, 2022?

**A.** No.

MR. SARNELL: No more questions. Thank you very much.

THE WITNESS: Thank you.

THE COURT: Mr. Pruitt, any questions?

MR. PRUITT: Only a few, Your Honor.

THE COURT: Go ahead.

MR. PRUITT: Thank you.

CROSS-EXAMINATION

BY MR. PRUITT:

**Q.** It's still morning. Good morning.

**A.** Good morning.

THE COURT: Just be sure to get close to the microphone so the court reporter can hear you.

MR. PRUITT: Sorry. She won't be able to see me, but that's okay. Better to hear me, I think.

BY MR. PRUITT:

**Q.** Ma'am, I think you mentioned at the beginning of your testimony that there was prior management of the building and they issued fobs as well?

**A.** Yes, uh-huh.

**Q.** Is it -- it's possible, isn't it, that there may not be perfect records of current management for all the fobs that have been issued in the past?

Colleen M. Conway, Official Court Reporter

Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 30 of 52

Everett - cross by Pruitt                                    30

A.  Anything's possible, yes.

Q.  And, ma'am, I have some experience with a key fob.  I have a building with a key fob.

Sometimes the doors are left ajar.  They don't close all the way.  Isn't that right?

A.  Our closers are modified by maintenance on a regular basis.

Q.  It's possible that a door can be left ajar sometimes, though, and someone doesn't need a fob to enter; isn't that right?

A.  Yes.

Q.  And sometimes, even though maybe they're not supposed to, people let other people follow them into the building, I'm sure; isn't that right?

A.  Yes.

Q.  And, ma'am, is there not a front door to the building that doesn't have a key fob requirement that people can just come in off the street through?

A.  No.  Everything to the units requires a key fob.

Q.  And, ma'am, is there -- there's a doorman at the building, isn't there?

A.  Yes.

Q.  And if the doorman recognizes a resident, will he sometimes let them in?

A.  Yes.

Q.  Okay.  And in that instance, they wouldn't need their key

**31**

fob, would they?

**A.** Correct.

MR. PRUITT:  No further questions, Your Honor.

THE COURT:  Any redirect?

MR. SARNELL:  No, Your Honor.

THE COURT:  Ms. Everett, thank you.  You may step down.  Please put your mask back on.  And you are excused.

(Witness excused.)

THE COURT:  Is there any further information or evidence the government would like to present?

MR. SARNELL:  No, Your Honor.

THE COURT:  So let -- what I think we can do is I can entertain some argument now about what we ought to do given the factual record that we have.

I do accept, through counsel's representation, that Mr. Cosmano is asserting his Fifth Amendment privilege, so I am not going to compel him to make any statements.  I will accept his assertion of his Fifth Amendment rights.

I think the way the issues have been teed up, I understand both Mr. Cosmano's position of the quantum of evidence that I have before me being not sufficient to, by clear and convincing evidence, establish contempt that Mr. Cosmano has made recent efforts to try and return some of the property; that the government's estimate of the damages or the value placed on the items is overstated and might include items

Colleen M. Conway, Official Court Reporter

Case 24-09140   Doc 134-23   Filed 07/31/26   Entered 07/31/26 13:53:19   Desc
Exhibit 23: Transcript of May 5   2022 Contempt Hearing   Page 32 of 52

Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 32 of 52

**32**

that ought not to be covered by any kind of contempt sanction; and that incarceration is not an appropriate sanction for contempt and not likely to be a meaningful way to purge any kind of contempt.

So I understand those are the arguments raised by Mr. Cosmano.  And I understand the government's argument that, factually, there is sufficient evidence to certainly infer that -- for example, with respect to the wall, that it was up. According to the declaration of the receiver, it was up in November.  The unit was in pristine condition at the time.

The swipe records show that Mr. Cosmano was not swiping in and out, but there's other evidence that demonstrates he was present on March -- around March 4th or 5th.  Mr. Cosmano is not disputing that.  And Mr. Cosmano is not disputing that the wall was at some point destroyed.

So putting all that together, the government's position is that there is sufficient evidence that he's responsible post my order.  Further supported by the absence of any complaint of having a term in the order that says, "Don't tear down the wall," because it was already gone, one might have complained about that.  That that's all sufficient to infer that he was responsible -- in direct violation of a clear command in my orders that he was responsible for the wall being removed.  Along with the other arguments that the government has made about both the value and the items that were

Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 33 of 52

33

apparently missing and at some point in time removed.

There's no dispute that the unit is in some state of -- what I'll say disrepair or perhaps even shambles in terms of cabinetry, counters, and the like.  And there's no dispute that the washer and dryer, for example, are gone and have not yet been returned.

So I say all of that to say, that's how I understand the different parties' positions and where we stand.  And I have another matter at 11:30 I'm going to have to take, but I can hear a few minutes from each of you about what you would like by way of order from me this morning and then we'll reconvene and I'll give you a ruling.

So it's the government's motion, so I'll give you first -- just a couple of minutes, please, on what you'd like to do at this point.

MR. SARNELL:  Thank you, Your Honor.

So at the most base level, Mr. Cosmano has said he has some -- he has some items that he can return and other items that he -- other items.  And specifically, I would note the cabinets that he had at one point removed from the condo and then has somehow disposed of, I think it is likely within Mr. Cosmano's ability to get those back.

He should -- well, I guess, first off, we want a finding of willful contempt of both orders.  I think that's not really in dispute that we want this.

**34**

Then with regard to that second order, he was ordered to return everything and didn't.  And relying on his promises is, I think at this point, foolish.

So he should be required to return everything that he took from the apartment, all the fixtures, appliances, and improvements, as well as anything he took from behind the wall, within seven days on penalty of incarceration.

It will be his further failure to comply that will lead to incarceration as a sanction.  It's not his previous conduct.  It's his continued and ongoing failure.

He's also -- Mr. Cosmano's attorneys have also made representations that he doesn't have the money to fully pay the $167,000, but he should be required to pay as much money as he possibly can into the registry to allow the repairs to be made.

And then, overall, we think the $167,000 is a reasonable estimate of what it will take to put the condo back into the condition that it was in and allowed to sell for the price before that -- you know, sell for the price that it would have sold for before he committed willful violations of the Court's order.

And finally, a finding that, you know, willful contempt was able -- was -- this was a willful attempt to evade or defeat the tax.  The legal import of that can be determined by another judge.  But I think it's fair to say that when he went in and he ripped out everything -- he took everything,

Colleen M. Conway, Official Court Reporter

**35**

including the kitchen sink, Your Honor -- that that is a willful attempt to defeat the government's collection of his tax.

And that is the relief that we would request.

THE COURT:  Mr. Pruitt?

MR. PRUITT:  Thank you, Your Honor.  I'll be brief.

The seriousness of this matter is not lost on Mr. Cosmano.  And I'm sure the Court will think it should have been clear to him much earlier, and it should have been, Your Honor. And his compliance from this point forward, and the need for that, is very clear to him, believe me.

Your Honor, this is a civil contempt proceeding.  A finding of willfulness is not an element of civil contempt.  I do not think that would be appropriate here given that the government's sought civil contempt, which simply seeks for the person to comply with the order.

He stands ready to, to the best of his present ability, purge that contempt and comply, Your Honor, at this point in time.

There are some things that are simply gone and he cannot get them back.  It's not in his interest to say that he can't get them back, because now he'll have to pay for them. If he could produce them, he certainly would.  The kitchen cabinets are not -- (audible phone interference).

Your Honor, I just want to -- I'm taking this a

**Colleen M. Conway, Official Court Reporter**

**36**

little out of order, so I apologize.

But I just heard counsel mention wanting a finding that this is somehow related to his attempts to avoid tax.  I think that is outside the proper scope of these proceedings and would not be appropriate.

Coming back to the issue of the estimate and the loss for the government, Your Honor.

One thing I heard today just kind of, I think, underscores the need for a fuller and more detailed basis from the government for what they're seeking.

In the receiver's original declaration, sworn declaration, she said that the refrigerator was not the original refrigerator taken from the unit.  She's now filed another one that said it is, in fact, the original refrigerator, but it has a dent.

I heard counsel here today say that it's nonfunctional, which is the first time I've heard that.  And it is not in her declaration.

So this is why -- it's just one example, Your Honor, of why we need a -- I think a fuller and more robust record, so that we and the Court can judge what is a fair compensation for the government here.

Your Honor, with respect to the removal of the wall, I will just say this.  I mean, you heard the testimony.  I think while it's certainly -- one inference is that he did not

Case 24-09140   Doc 134-23   Filed 07/31/26   Entered 07/31/26 13:53:19   Desc
Exhibit 23: Transcript of May 5   2022 Contempt Hearing   Page 37 of 52

Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 37 of 52

**37**

enter the building during those time periods.  I think based on the cross-examination, there's also the ability to believe fairly and reasonably that he could have entered the building, and it simply wouldn't have registered.  So I don't think there is necessarily proof to a clear and convincing evidence standard that he did not enter in that time.

But also the idea that there's property behind that wall that was removed in violation of the order is, I think, rank speculation.  Your Honor, there's no basis to believe that it was walled off.  I don't think there's any evidence to suggest that there would have been fixtures or appliances, things that were the basis for the order.

Obviously, destroying the wall would have been in violation of your order, Your Honor, and I am not disputing that.

And finally, Your Honor, I just want to make sure the point is clear and I have not been misunderstood and Mr. Cosmano has not been misunderstood.

We were not meaning to suggest that the government is entitled to 14-year-old cabinetry to be reinstalled in there. Simply the fact that everything in there was 14 years old should be factored into what is a fair reimbursement to the government to replace those things.  So, for example, a brand-new Sub Zero refrigerator I do not think is necessarily fair compensation to the government if this refrigerator cannot

Case 21-00059   Doc 48-11   Filed 06/27/22   Entered 06/27/22 21:55:24   Desc  Ex. K
Transcript of May 5   2022 Contempt Proceeding   Page 38 of 52

**38**

be used.

And that's simply the point, Your Honor.  Just we want whatever is entered to be fair, reasonable, and reasonably related to items that cannot be replaced and to damage caused by the removal of items.  And the government is certainly entitled to that.

But while this is in no way meant to excuse any contemptuous conduct that the Court finds, this isn't an opportunity for a windfall or to, you know, improve the unit beyond where it was before, Your Honor.

THE COURT:  Is there anything you would like to say or proffer in terms of Mr. Cosmano's wherewithal and financial resources?

MR. PRUITT:  I can, Your Honor.  I -- if it's not obvious, his wherewithal is very limited.  I have had conversations with him about this, Your Honor.

Based on where things stand currently, I think that coming up with anything beyond $20,000 at this point in time today would be difficult for him, Your Honor.  And I think he would have to borrow that money.

Your Honor, I can consult with him further, if further time would allow him to lay hands on more money, because obviously he understands that it is in his interest to purge this and get this paid as much as he can, as soon as he can.  At the same time, Your Honor, he understands and realizes

39

that to the extent he can't, that there will be some form of judgment entered against him, that he owes the government that money, that it will be something that he will have to address and will have to pay.

THE COURT:  Okay.  Thank you.

What I'd like to do now is take another break, another recess so that I can attend to another matter, and then let's -- maybe we ought to reconvene, say, at -- I think we could do 1:00 o'clock.

Would that work for the government, if we reconvene at 1:00 o'clock?  I don't know what your travel plans are.

MR. SARNELL:  Flight out's at 4:00, Your Honor.  So unless there is some major traffic between here and O'Hare -- it would be close to unprecedented for the time of day -- I think we'd be all right.

THE COURT:  I'll let you run that risk.  But we'll reconvene at --

MR. PRUITT:  Your Honor, I'm sorry to interrupt.  I have a daughter who needs to be picked up by school at 2:30 in Orland Park, and it's my responsibility today.

If I leave at 1:30, I'll be really pushing it.  So if -- but, Your Honor, if we could get done by 1:30, I'm happy to reconvene at 1:00.

THE COURT:  Sure.

MR. PRUITT:  If we could do it a few minutes before,

**40**

that helps me out, Your Honor.

THE COURT:  Sure.  Why don't we reconvene, then, at 12:45.

MR. PRUITT:  That would be very helpful, Your Honor. Thank you.

THE COURT:  Okay.  We'll be in recess until 12:45. Thank you, all.

MR. SARNELL:  Thank you, Your Honor.

(Recess from 11:31 a.m. until 12:45 p.m.)

41

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WILMINGTON SAVINGS FUND SOCIETY, FSB,    )
                                         )
              Plaintiff,                  )
                                         )
      vs.                                 )      No. 20 C 7032
                                         )
JAMES A. COSMANO, et al.,                 )      Chicago, Illinois
                                         )      May 5, 2022
              Defendants.                 )      12:45 o'clock p.m.


                TRANSCRIPT OF PROCEEDINGS - Hearing
                BEFORE THE HONORABLE MANISH S. SHAH


APPEARANCES:

For the Plaintiff/          KLUEVER LAW GROUP, L.L.C
Counter-Defendant:          BY:  MR. JASON D. ALTMAN
                            225 West Washington Street, Suite 1550
                            Chicago, Illinois  60606
                            (312) 201-6658

For Defendant Cosmano:      COTSIRILOS, TIGHE, STREICKER, POULOS
                            & CAMPBELL, LTD.
                            BY:  MR. ERIC S. PRUITT
                            33 North Dearborn Street, Suite 600
                            Chicago, Illinois  60602
                            (312) 263-0345

                            BACH LAW OFFICES
                            BY:  MR. PAUL M. BACH
                            P.O. Box 1285
                            Northbrook, Illinois  60065
                            (847) 564-0808

For Defendant/Counter-      U.S. DEPARTMENT OF JUSTICE
Claimant United States:     TAX DIVISION
                            BY:  MR. BRADLEY A. SARNELL
                                 MR. NOAH D. GLOVER-ETTRICH
(telephonically)                 MR. JEFFREY N. NUNEZ
                            P.O. Box 55
                            Washington, D.C.  20044
                            (202) 307-1038


                Colleen M. Conway, Official Court Reporter

**42**

APPEARANCES (Continued):


Also Present:                    MR. JAMES A. COSMANO












COLLEEN M. CONWAY, CSR, RMR, CRR
Official Court Reporter
219 South Dearborn Street, Room 1918
Chicago, Illinois 60604
(312) 435-5594
*colleen_conway@ilnd.uscourts.gov*

43

(Proceedings heard in open court:)

THE CLERK:  Recalling 20 C 7032, Wilmington Savings Fund versus Cosmano.

THE COURT:  Good afternoon, everyone.  Everyone is present, and we are reconvened.  And I can give you a ruling now on the pending issue of contempt as to Mr. Cosmano.

There are in place two clear and unambiguous court orders.  The February 17th, 2022 court order requires all parties to cooperate fully with the receiver.  It also requires all persons occupying the property to leave in place all fixtures, appliances, and improvements, without disturbance to the premises.  No party shall take any action to remove the false wall or any property located behind that wall unless the receiver and the representatives of the United States are present for the removal of the wall.  Mr. Cosmano shall not do anything that tends to reduce the value or marketability of the subject property or cause or permit anyone else to do so.

The second order is the March 6th order which includes a provision that Mr. Cosmano shall immediately return to the U.S. Marshal's Service all fixtures or appliances removed from the subject property.

I find that Mr. Cosmano violated these orders.

I find that he caused the destruction of the false wall after my February order.

I do credit the government's evidence that Mr.

Colleen M. Conway, Official Court Reporter

**44**

Cosmano didn't access the unit before then.

And the argument from the defense that was suggested about the reliability of the government's evidence does not persuade me that Mr. Cosmano could have entered the unit with a crew or a sledgehammer and not leave some trace in the key fob records before February.

I draw what I conclude to be a reasonable inference from the receiver's declaration and the testimony of the property manager that, based on the appearance of the unit in November and then later in March, that it was -- and the key fob records, that it was Mr. Cosmano who caused the removal or destruction of that wall, and it occurred after my February order.

Mr. Cosmano, I find, also did not immediately return to the United States Marshal's Service all fixtures or appliances after March 6th.  He does not dispute that he still has the washer and the dryer and other fixtures and appliances.

These were significant violations and a substantial lack of compliance on Mr. Cosmano's part.

The wall was supposed to stay up, and the fixtures and appliances were supposed to be returned.  Neither happened, as ordered, and that was a significant violation.

These provisions of these orders were important. They go to the marketability and the value of this property, which I have ordered foreclosed on.  And the value of this

**45**

property belongs, in large part, to the mortgagor and the lienholders first.

These violations attack the purpose of the order, which makes the violations not only clear violations of specific terms, but also significant in terms of consequence and purpose.

Mr. Cosmano did not take reasonable or diligent steps to comply with these orders.  He, as I have found, caused the wall to come down and didn't return everything.

His recent overtures through counsel are too late to be reasonable or diligent.  They are mitigating in terms of the opportunity to compensate for the harm caused, but these are post-contempt mitigation efforts.

So I do find Mr. Cosmano in civil contempt.  I don't know what his motive was for this, and I make no conclusion or finding about whether it was to evade or defeat a tax, but I do find that it was a willful violation of my orders.  They were clear orders, unambiguous.  Mr. Cosmano is a lawyer, and he well knew that court orders are to be followed.  Whatever motivated his decision, it was a willful one relative to my orders.

The remedy should enforce the orders and compensate for losses or damages sustained as a result of the contemptuous conduct.

So I order Mr. Cosmano to return any fixtures,

**Colleen M. Conway, Official Court Reporter**

**46**

appliances, or improvements from the subject property that he currently has control over to the receiver within two days.

I also enter a monetary judgment against Mr. Cosmano in the amount of $150,000, due immediately, with post-judgment interest accruing at the federal statutory rate.

I find that amount to be a reasonable amount to compensate for the damages.  Some appliances and fixtures are likely to be returned.  And putting the unit back to its value should account for some lowered values than what the government has estimated for the reasons -- some of the reasons that Mr. Cosmano's counsel has pointed out.  I think discounting the government's estimate of 167,000 down to $150,000 accounts for more appropriate replacement values and the likely return of some of the property.

Further violation of the February order, the March order, and today's order can be met by contempt sanctions again, including jail, if I conclude that it is necessary to jail Mr. Cosmano to obtain compliance.

I expect that this order will be reported to the Illinois Attorney Registration & Disciplinary Commission.

The receiver is already authorized to spend money to fix the place up and obtain reimbursement from the sale proceeds.  So I see no reason for the receiver to wait to continue to conduct efforts to get this unit in shape to be marketable.  And it may be difficult to wait for Mr. Cosmano's

**47**

payment.  The judgment will be in place.  But I expect the receiver to take steps to keep the process moving forward.

I would ask that the government prepare a proposed order memorializing my oral ruling, and that way I can get it entered promptly.

With that, then that will conclude the pendency of the rule to show cause.  I have now found that Mr. Cosmano is in contempt.

Is there anything further we should address this afternoon on behalf of the government?

MR. SARNELL:  We don't believe so, Your Honor, no.

THE COURT:  On behalf of Wilmington, is there anything you would like me to address this afternoon?

MR. ALTMAN:  Judge, just -- and it may be a little too much too late, but in the current economic situation that we find ourselves all in, with raw material shortages, with interest rates rising, if the property is to be returned to its pre-damaged condition, that is, custom cabinets being ordered, manufactured, delivered, and installed, custom countertops, two bathrooms or three bathrooms to be completely reconstructed, to remedy the damages, speaking from personal experience, having to replace a front door in a residence which took me six months, we could be looking down the barrel of six months, nine months, a year to restore the property.

All that while, there are carry costs.  My client has

**48**

paid, and will continue to pay, the property taxes, which exceed $20,000 per year, on this property.  There are condominium dues that must be paid on a monthly basis.  There is insurance to insure the property, which must be paid.  None of this is going to be paid by Mr. Cosmano.

So the remedy, I think, although Your Honor has issued its ruling and its judgment, I think is really better equipped -- because I don't think it's practical to restore the property to its pre-damaged condition, but rather the remedy is probably the delta in the difference between the property value, you know, pre-damage to what it could have been sold had the damage not occurred.

Again, it may be too little too late, but it is worth noting as -- you know, this sale, if the property is to be restored, will not take place overnight, it will not take place in a month.  It will take place, more likely than not, in 2023.

THE COURT:  I appreciate the point.  And I did consider the delta, which had been represented in the declaration of the receiver.  And I appreciate your point about how that might even be understating the delta given the costs of delay that end up getting borne by the bank.  Nevertheless, I still conclude that $150,000 is appropriate damages for the contemptuous conduct that I have found.

I understand that this unit and this foreclosure has turned into an odd piece of property to be on anyone's books.

**Colleen M. Conway, Official Court Reporter**

**49**

Because there is value there.  And it really ought to have been sold sooner, and people could have extracted value from it.  And that has been harmed.

I'm trying to compensate for the contemptuous piece of that.  But there are other harms that are swirling around this that are, frankly, a mystery to me on why that is -- why this has happened.  But I am satisfied with the remedy that I have ordered with respect to the contempt.

Judgments are going to have to be made about how to proceed with the sale of the property.  If you decide that it's not worth waiting six months because of supply chain problems and you need to get it off the books, but there's value in it that's sufficient to pay off the mortgage and extract some return on the lien, the tax lien, those are judgments that the receiver and the stakeholders are going to have to make.

But you are empowered to foreclose on this and sell this property in a reasonable way, and you have every incentive to do it in a way that maximizes your respective positions in the property.

Anything else on behalf of Wilmington?

MR. ALTMAN:  No, Your Honor.

THE COURT:  Anything else on behalf of Mr. Cosmano?

MR. PRUITT:  One question, Your Honor.  Because we only have two days to get it back, I want to make sure that we are doing this appropriately.

Colleen M. Conway, Official Court Reporter

**50**

Who should we be coordinating with?  The Marshal? The receiver?

THE COURT:  I have ordered it to be the receiver.  I think the receiver is the person in charge.  I will leave it to the government through the receiver.  If the government wants to rearrange the services of the Marshal, but I understood from -- I think it was a footnote in one of the briefs that the Marshal's Service has closed their file on this.

So I think it's -- ultimately, it's the receiver's responsibility to put this place back in shape.  So that's why my order is to the receiver.

MR. PRUITT:  Your Honor, I will -- and I'm sorry.  I didn't mean to talk over you.  I will copy counsel for the United States, obviously any communication with the receiver. But I just want to make sure we're not wasting time going through the wrong party.  So I appreciate that.

THE COURT:  Understood.

MR. SARNELL:  Your Honor, one follow-up question.

I believe the order enforcing the March 7th order does include that Mr. Cosmano himself is to stay away from the unit.  If that's -- my understanding is that would still be in place?  Yes, Your Honor?

THE COURT:  Yes.  I have not altered the terms of any of the other orders that are in place.  I have just supplemented with the additional findings and remedy that I

**Colleen M. Conway, Official Court Reporter**

**51**

have ordered.

I appreciate the presentation of the parties this morning and afternoon, and we are in recess.

MR. PRUITT:   Thank you, Your Honor.

MR. SARNELL:   Thank you, Your Honor.

(Proceedings concluded.)

C E R T I F I C A T E

I, Colleen M. Conway, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Hearing proceedings had in the above-entitled case before the HONORABLE MANISH S. SHAH, one of the Judges of said Court, at Chicago, Illinois, on May 5, 2022.

*/s/ Colleen M. Conway, CSR, RMR, CRR*        *06/10/22*

Official Court Reporter                Date
United States District Court
Northern District of Illinois
Eastern Division